IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,                    )
                                             )
                    Plaintiff,               )
                                             )        3:12-CR-90
                                             )
                                             )        (VARLAN / GUYTON)
DONA RECTOR,                                 )
                                             )
                    Defendant.               )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.§

636(b) for disposition or report and recommendation regarding disposition by the District Court as

may be appropriate.  This case is before the Court on Defendant Dona Rector's Motion to Suppress

Alleged Statements of Defendant Rector [Doc. 100], filed on September 3, 2013.  The parties

appeared for an evidentiary hearing on the motion on October 2, 2013.  Assistant United States

Attorney Frank M. Dale, Jr., appeared on behalf of the Government.  Attorney Michael B. Menefee

represented the Defendant, who was also present.  At the conclusion of the hearing, the Court

granted defense counsel's request to file a post-hearing brief after he received the transcript of the

hearing.  The Defendant filed a post-hearing brief [Doc. 113] on November 5, 2013.  The

Government filed a responding post-hearing brief [Doc. 119] on November 25, 2013.  Thereafter,

the Court took the motion, the testimony, the exhibits, and the briefs under advisement.


## I.  POSITIONS OF THE PARTIES

Defendant Dona Rector is charged with conspiring to commit wire fraud with Codefendants

1

Joyce Allen, Sharon Thomas, and Paulynn Wright from July 16, 2008, to March 2, 2012.[1]  The Defendant asks [Docs. 100 and 113] the Court to suppress the oral and written statements that she gave on May 10 and 16, 2013, because these statements were gained in violation of her rights under the Fifth and Sixth Amendments to the United States Constitution.  She argues that the agents did not advise her of the Miranda warnings before either statement and that the totality of the circumstances caused her to feel that she could not leave or ask the agents to leave.  Additionally, she contends that although she was a target of the grand jury investigation, the agents interviewed her outside the presence of her retained attorney in violation of her Sixth Amendment right to counsel.

The Government responds [Docs. 107 and 119] that the Defendant was not in law enforcement custody at the time of the May 10 and 16, 2013 interviews, and, thus, the Miranda warnings were not required.  It also argues that the Defendant's attorney was representing her on a separate civil matter, and there was no need to invite him to the interviews, which occurred prior to the Defendant being charged.

## II.  SUMMARY OF THE TESTIMONY

At the October 2 hearing, the Government called two witnesses, United States Postal Inspector Wendy Boles and Special FBI Agent Joelle Olszewski.  Defense counsel called Special IRS Agent David Martin.  These witnesses testified as follows:

---

[1]At the time of the October 2, 2013 evidentiary hearing, Defendant Rector was charged in Count Two of the Second Superseding Indictment [Doc. 57].  On March 18, 2014, the Grand Jury entered a Third Superseding Indictment [Doc. 141], which only changes the forfeiture allegations with regard to Defendant Rector.

United States Postal Inspector Wendy Boles testified that she has been a postal inspector for ten years. On May 9, 2013, she and Special IRS Agent David Martin went to the home of Dona Rector. Inspector Boles stated that she was wearing business casual clothing, was not wearing a police jacket, and was carrying a firearm. She stated that she is required to carry a weapon and that her firearm was concealed. Inspector Boles said that the Defendant's daughter Heather Taylor answered the door. Ms. Taylor appeared to be in her mid- to late-twenties. The Defendant was not home but the agents spoke briefly with Ms. Taylor outside the house. Agent Martin gave Ms. Taylor his business card bearing his cellular telephone number and asked that Rector call him.

Inspector Boles stated that later Agent Martin told her that he received a call from Attorney Jonathan Cooper. Mr. Cooper said that he had represented Rector's family in a civil matter and wanted to know what Agent Martin wanted with Rector. Mr. Cooper said that he was not representing Rector in the instant investigation. After talking with Mr. Cooper, Agent Martin received a call from Rector, who agreed to meet with him the next day. Rector told him that she worked on Parkside Drive, near his office on Cedar Bluff Road, and that she would come to his office at 10:00 a.m.

Inspector Boles identified a photograph [Exhibit A] of the door to the IRS-CI office, where Agent Martin works. The photograph reveals that the metal door, which has no window, is painted tan and has an electronic lock with a keypad. Inspector Boles testified that she did not have the combination to that keypad and that only the employees of the IRS-CI office know that combination. She said that the inside of the door did not have a lock and could be opened by turning the handle. She stated that the door is not heavy.

Inspector Boles testified that she was inside the IRS office on the morning of May 10, 2013,

when Rector rang the doorbell and someone opened the door for her. Rector was not searched or required to go through a metal detector. She was not handcuffed or restrained in any way. The interview took place in the conference room, which contains a wooden table surrounded by cloth-covered chairs. Inspector Boles stated that she and Agent Martin sat across the table from Rector, whose back was to the windows on one side of the room. She stated that Rector had easy access to the conference room door and was not blocked by the agents. She said that they all remained seated during the interview, although she or Agent Martin might have stood briefly to show Rector a document. The agents did not threaten or attempt to intimidate Rector, and Rector never seemed upset, nor did she cry. Inspector Boles characterized the interview as pleasant.

Inspector Boles stated that the interview lasted one hour and five to eight minutes. Toward the end of the interview, the agents noticed Rector looking at her watch and asked her if she needed to leave. Rector, who had her cellular telephone with her throughout the interview, said, "No" and that she was the assistant manager and would call her employer. Inspector Boles said that when Rector called her employer, she did not tell him or her that she was being interviewed by the IRS. At the end of the interview, Inspector Boles and Agent Martin stepped out of the conference room and conferred about whether they had any additional questions. Once the interview ended, Inspector Boles and Agent Martin escorted Rector to the office door, and she left. They did not escort her out of the building.

Inspector Boles testified that she was present when Rector was arrested on May 24, 2013. On that day, she and Agent Martin were wearing bulletproof vests covered by their police jackets. Rector was asleep when they arrived at her home. They were at Rector's house about one-half hour during which they allowed Rector to fix her hair, gather some belongings, and make a telephone call.

4

Inspector Boles said that they waited until a neighbor had passed before walking Rector outside, in order not to embarrass her.

On cross-examination, Inspector Boles stated that the <u>Miranda</u> warnings were not given to Rector at the May 10 interview. She stated that she carried her firearm at all times when on duty, except when appearing in court or when in the United States Marshal's Office. She stated that she carries her firearm in a holster on her waist. The holster sits on the back side of her hip and is covered by her jacket or an outer shirt. She wears her badge on her belt three to four inches away from her gun. Inspector Boles said that when she spoke with Rector's daughter on May 9, she showed her credentials. She did not know whether Rector's daughter saw her badge or her gun.

Inspector Boles stated that she was not a party to Agent Martin's telephone conversation with Rector on May 9. She stated that per that telephone conversation, there was a mutual agreement to meet at the IRS office at 10:00 a.m. on May 10. She believes that Agent Martin told Rector that they wanted to talk with her with regard to a grand jury investigation of Benchmark Capital and others. She stated that although an indictment was already pending as to Benchmark, she and Agent Martin were gathering additional information for a superseding indictment. She did not know if anyone told Rector about the pending indictment.

With regard to the interview at the IRS office, Inspector Boles stated that she thought Rector could see her badge but not her gun during the interview. The door to the IRS office is metal but is not solid. She did not know whether the window beside the IRS office door is made of bulletproof glass. She agreed that the IRS window and door were secure, observing that the door has a keypad. She stated that she did not tell Rector that the IRS office door was not locked from the inside or that she was free to leave. Inspector Boles said she believed one could tell from looking at the inside of

the door that it could be opened without being unlocked.

Inspector Boles said that in the conference room, Rector sat with her back to the window and the door on her right. Inspector Boles sat at the end of the table with her back to the door, and Agent Martin sat across from Rector. Inspector Boles agreed that her and Agent Martin's chairs were the closest chairs to the door. She agreed that she was between Rector and the door but said that Agent Martin was not. She said that she or Agent Martin may have stood at some point during the interview. She said that although Agent Martin could have reached across the table to hand documents to Rector, it may have been more comfortable for him to stand, although she did not specifically recall him standing. She said the tenor of the interview was "very casual [and] comfortable." [Doc. 110, p.29]

Inspector Boles recalled that during the May 10 interview, someone brought up that Rector was going to be late for work. Either she or Agent Martin asked Rector if she needed to leave. Rector stated that she needed to call her employer. Rector made the call while she and the agents were still seated at the conference table. During the interview, three documents–a September 16, 2008 letter from Benchmark Capital and two emails from September 15, 2008–were shown to Rector. These documents were gained during the execution of a search warrant in 2012, which was months before the interview with Rector.

Inspector Boles testified that the decision to indict Rector was made after the May 10 and 16 interviews. During the interviews, the agents gathered facts regarding Rector's involvement and role. She stated that during the first interview with Rector, they gained information on her admitted involvement in a fraudulent application for Paulynn Wright. Inspector Boles said that she was not involved in the second interview of Rector.

6

Inspector Boles stated that on the day of Rector's arrest, she spoke with Attorney Cooper, who mentioned his previous conversation with Agent Martin. Based on this conversation with Mr. Cooper, Inspector Boles believed that Mr. Cooper knew about the agents' investigation of Rector. She acknowledged that she was not a party to Mr. Cooper's telephone call to Agent Martin on May 9. She did not invite Mr. Cooper to the May 10 interview.

On redirect examination, Inspector Boles clarified that the May 10 interview began at 9:08 a.m. and ended at 10:16 a.m. She stated that Agent Martin carried his firearm in an ankle holster. When the May 10 interview was scheduled on May 9, Agent Martin and Rector arranged to meet at the IRS office at 9:00 a.m. with the expectation that Rector would leave after the interview. During the interview, Agent Martin asked Rector if she needed to leave in order to make it to work on time. Rector called her employer on her personal cellular telephone and did not ask for privacy during the call, which lasted a minute or two. Inspector Boles also clarified that Benchmark Capital was never indicted. Instead, at the time of the May 10 interview, Joyce Allen and Kay Thomas had been indicted with regard to the investigation of Benchmark Capital.

On recross-examination, Inspector Boles testified that she became aware that Rector was going to be late for work at around 10:00 a.m. on May 10. She agreed that given the distance between Rector's employer and the IRS office, Rector was probably going to be one-half hour late to work.

Special FBI Agent Joelle Olszewski testified that she had worked as an FBI agent for two and one-half years. She and Special Agent David Martin interviewed Rector on May 16, 2013. On that day, they were interviewing another person who lived close to Rector. When they finished that interview, they called Rector and asked if they could stop by her house and talk with her. Rector

7

agreed. When they arrived at Rector's house, she was awake and willing to be interviewed. A man, whom they later learned was Rector's fiancé, was also present initially. The man stated that he was leaving but that he did not need the agents to move their car, which was parked behind his car. Agent Olszewski stated that she was dressed in business casual attire and was carrying her weapon in an ankle holster. She stated that she is required to carry a weapon but that her firearm was covered by her pants leg and was not visible.

Agent Olszewski stated that Rector invited the agents into her house and directed them to seats in her living room. She said that she took notes during the interview. Agent Martin stood on a couple of occasions to hand documents to Rector but then sat down again. Rector was not restrained during the interview, and nothing was done to inhibit her movements. Rector was not searched prior to the interview. Agent Olszewski stated that the interview was not aggressive, and the agents did not intimidate Rector. Agent Olszewski said that Rector was not upset or visibly shaken during the interview and did not cry. She said that the agents did not raise their voices, yell at Rector, or threaten her. She stated that the agents left the interview on cordial terms with Rector.

On cross-examination, Agent Olszewski testified that she had been involved in twenty investigations and had conducted more than one hundred interviews as an FBI agent. She stated that she had provided the Miranda warnings in less than twenty of these interviews. She is trained to give the Miranda warnings when the person is in custody. She said on May 16, 2013, she and Agent Martin had been interviewing another individual about this case and had received some mortgage documents with Rector's name on them. They decided to interview Rector to get clarification on the documents. She stated that she was in the car with Agent Martin when he called Rector to ask if they could meet with her. She said that Rector's fiancé left before they began talking to Rector.

8

Agent Olszewski said she did not consider the interview of Rector to be an "interrogation" because Rector was not in custody. She stated that she sat across from Rector during the interview and either kept her feet on the floor or crossed her ankles. She stated that even when seated, her pants leg extended down to her shoe, covering her weapon. Agent Martin also sat across from Rector and could not have handed Rector documents without standing and crossing the room. At some point, information learned during the May 16 interview was presented to the United States Attorney's Office. Agent Olszewski testified that the decision to indict Rector was made after the May 16 interview.

Special IRS Agent David Martin testified that he went to Rector's home on May 9, 2013, but Rector was not there. He stated that he did not have her telephone number at that time and did not call her before going to her house that day. Agent Martin said he knocked on the door, and Rector's daughter answered. Agent Martin asked if Rector was there, and Rector's daughter said she was not and asked what the agents wanted. Agent Martin identified himself, said he needed to talk to Rector on an official matter, gave Rector's daughter his business card, and "said please have your mother give us a call." [Doc. 110, p.56] He stated that he was carrying a firearm but was not wearing a badge. He did not recall if he showed Rector's daughter his credentials, but he said his business card lists his name and occupation.

Agent Martin stated that after he returned to his office that day, he received a call from Rector's attorney. The attorney asked why Agent Martin wanted to talk to Rector. Agent Martin said he told the attorney that he wanted to talk to Rector "about the Benchmark Capital/Joyce Allen matter." [Doc. 110, p.57] The attorney said he represented Rector and her daughter on a civil matter relating to Rector's mother's death. Agent Martin said he did not tell the attorney that Rector was

9

under investigation or that she was a suspect in a criminal conspiracy. He said the conversation with the attorney was very brief.

Agent Martin testified that Rector called him after he spoke with the lawyer, so he assumed that the lawyer had approved of Rector calling him. Agent Martin stated that he told Rector that he understood that she "use to be involved or worked with Joyce Allen and Benchmark Capital as a mortgage broker." [Doc. 110, p. 59] He told her that he wanted to talk to her about that time period. Agent Martin said he did not tell Rector that she was under investigation or that she was a suspect in a criminal conspiracy. At that time, Agent Martin had documents with Rector's name on them and was trying to determine her role. He said that from the documents, it appeared that Rector was involved in a questionable mortgage transaction. Agent Martin stated that during the telephone call, he and Rector arranged to meet at 9:00 a.m. the next day. He said that Rector told him that she worked at Applebee's and that she had to be at work at 10:00 a.m. He told her where his office was located. He stated that they mutually agreed his office would be a good location at which to meet. He stated that he did not recall whose idea it was to meet at the IRS office but stated that it was probably his idea. He suggested that they meet an hour before she had to be at work, because he thought that the meeting would take around one hour.

Agent Martin testified that the following day, May 10, 2013, Rector rang the doorbell to the IRS office, and either he or someone else in his office answered the door. He stated that the reception window beside the door was made of heavy glass that may be bulletproof. He stated that the office door is heavier than an interior door and has a lock on it. Persons arriving at the IRS office have to be escorted in. He agreed with Inspector Boles' testimony on where the agents and Rector sat in the conference room. He stated that he was directly across the table from Rector and not

10

between Rector and the conference room door. He said he remained seated during the meeting, except that he stood to pass documents to Rector. He agreed that he may have remained standing briefly while asking her questions about the documents.

Agent Martin stated that he did not provide the <u>Miranda</u> warnings to Rector at the meeting. He stated that he is required to have access to his firearm at all times and that he was carrying it that day. He said that he did not tell Rector that she could leave the meeting. When it got close to 10:00 a.m., he said that he knew she had to be at work and asked if she wanted to reschedule the meeting for later. He said that Rector responded that she was the assistant manager and that she could call her employer and stay a little longer. He said that he and Inspector Boles did not leave the room during Rector's telephone call but that he did not recall the details of her conversation with her employer. He showed Rector the documents prior to her telephone call to her employer. He stated that the whole purpose of the interview was to show her those documents so that she could explain them. The documents were obtained during the March 2, 2012 execution of a search warrant at the home of Joyce Allen. He said that Inspector Boles took notes during the interview. During the interview, Rector told them that she worked nights at the restaurant, but Agent Martin said she did not appear tired during the interview.

Agent Martin testified that before meeting with Rector at her home, he called and spoke with her. It was 3:45 p.m., and Rector did not say that he had awakened her. He had just received some documents during the interview of another individual who lived in the same vicinity, and he wanted to ask Rector about them. He said that Rector invited he and the other agent into her house and invited them to sit down in her living room. Rector was seated far enough away from him that he had to stand to hand her documents. He said that he may have stood while asking her questions in

11

order to point out items on the documents. He did not advise Rector that she could ask them to leave. He stated that he had not spoken with Rector's lawyer since May 9 and that he did not tell him about the May 16 meeting or invite him to attend. Agent Martin stated that the decision to charge Rector was made after the two interviews. He reviewed a draft of the Second Superseding Indictment after the interviews but he did not recall the precise date.

On cross-examination, Agent Martin testified that during the May 10 interview, Rector could have walked between Inspector Boles and the bookcase to leave the room. He stated that he did not invite Rector's lawyer to the interviews on May 10 and May 16 because the lawyer said that he represented Rector on a civil matter. Agent Martin said that when he told the lawyer why he wanted to talk with Rector, the lawyer had no objection to the interview. On redirect examination, Agent Martin stated that he told Rector's lawyer that he wanted to speak with her about her work in the mortgage business in relation to Benchmark Capital and Joyce Allen.

## III. FINDINGS OF FACT

Based upon the testimony and the exhibits from the evidentiary hearing, the Court makes the following factual findings:

On July 17, 2012, Joyce Allen and Sharon Kay Thomas were charged in a seven-count Indictment with uttering fraudulent securities and conspiracy to commit money laundering in relation to Benchmark Capital, an allegedly fraudulent investment firm. On May 9, 2013, Special IRS Agent David Martin and United States Postal Inspector Wendy Boles were investigating the Benchmark Capital matter. Pursuant to a search warrant executed at the home of Joyce Allen on March 2, 2012, the agents were in possession of documents that suggested that Dona Rector may have been involved

in a questionable mortgage transaction. On May 9, the agents traveled to Rector's home. The agents were dressed in casual clothing and were armed, but their weapons were concealed. Rector's adult daughter Heather Taylor answered the door. The agents identified themselves and asked to speak with Rector. Ms. Taylor told them that Rector was not home and asked why the agents wanted to talk to Rector. Agent Martin said that he wanted to speak with Rector on an official matter, handed Ms. Taylor his business card, and asked that Rector call him. The agents then left.

Later on May 9, after Agent Martin had returned to his office, he received a call from Attorney Jonathan Cooper, who identified himself as Rector's attorney and asked why Agent Martin wanted to talk to her. Agent Martin told Mr. Cooper that he wanted to talk with Rector about Benchmark Capital and Joyce Allen, but he did not mention that Rector was under investigation. Mr. Cooper stated that he represented Rector and her daughter in a civil matter relating to the death of Rector's mother. Mr. Cooper raised no objection to Agent Martin talking with Rector.

After his telephone call from Mr. Cooper, Agent Martin received a telephone call from Rector. He told her that he that he would like to talk to her about her previous work with Joyce Allen and Benchmark Capital as a mortgage broker. Rector agreed to meet with him and told him that she had to be at work at Applebee's at 10:00 a.m. the next day. Agent Martin told her that the IRS office where he worked was near Applebee's. He suggested that they meet at his office at 9:00 a.m. the following day. Rector agreed to the meeting.

On May 10, 2013, Rector went to the IRS office around 9:00 a.m. She rang the doorbell, and an employee opened the door for her and showed her to the conference room. The conference room held a wooden table surrounded by chairs and had a bank of windows on one wall. Rector was joined in the conference room by Agent Martin and Inspector Boles. Rector sat with her back to the

13

windows, Agent Martin sat across the table from her, and Inspector Boles sat at the end of the table between Rector and Agent Martin. The agents were dressed in casual clothing and were armed but their firearms were not visible. Although Inspector Boles sat between Rector and the conference room door, there was room for Rector to walk behind Inspector Boles to the door. The meeting lasted a little over one hour, and Agent Martin stood on a couple of occasions to pass documents to Rector or to point out items on the documents. Toward the end of the meeting, Agent Martin noticed that Rector was going to be late to work and asked if she would like to resume the meeting at another time. Rector told them that she was the assistant manager and that she could stay a little longer. She called Applebee's on her cellular telephone to tell her employer that she would be late. The meeting ended at 10:16 a.m., and Agent Martin walked Rector to the door of the IRS office. Rector then left the building on her own.

On May 16, 2013, Agent Martin and Special FBI Agent Joelle Olszewski were conducting interviews with regard to the Benchmark Capital matter. While interviewing an individual who lived close to Rector, the agents received some documents with Rector's name on them. After that interview, at around 3:45 p.m., Agent Martin called Rector and asked if they could meet with her. Rector agreed to meet with them, and the agents drove to her house. Rector met the agents at the door and invited them into her house and to sit down in her living room. Although Rector's fiancé was there when the agents arrived, he left shortly thereafter before they began talking with Rector. The agents were dressed in business casual clothing and were armed, but their weapons were concealed. The agents sat across the room from Rector, and Agent Martin stood on a couple of occasions to hand documents to Rector. The meeting lasted about forty-five minutes.

Following these interviews, the agents presented the information they had gathered to the

United States Attorney's Office, which decided to pursue charges against Rector. On May 21, 2013, Rector was charged in the Second Superseding Indictment. On May 24, 2013, Inspector Boles and other agents arrested Rector at her house.

## IV. ANALYSIS

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948. Additionally, the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."

The Defendant argues that her Fifth Amendment rights were violated because she was questioned by federal agents on May 10 and 16, 2013, without being advised of her Miranda rights. She also contends that her Sixth Amendment rights were violated because both interviews were conducted outside the presence of her attorney, even though she was represented by counsel at the time. For the reasons discussed below, the Court finds that the May 10 and 16, 2013 interviews were not conducted in a way that violated the Defendant's Fifth or Sixth Amendment rights. Accordingly, the Court finds no basis to suppress the Defendant's statements given during those interviews or any evidence gained as a result of those statements.

15

### A. The May 10 and 16, 2013 Interviews Were Not Custodial

The Defendant argues that her statements during the May 10 and 16, 2013 interviews must be suppressed because she was not advised of the Miranda warnings before either interview. The obligation to administer Miranda warnings to suspects only arises if there has been "such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). To determine whether an individual is in custody for purposes of Miranda, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. Salvo, 133 F.3d at 948; see also United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323; Mason v. Mitchell, 320 F.3d 604, 631 (6th Cir. 2003). The "'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Knox, 839 F.2d 285, 291 (6th Cir. 1988) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); Swanson, 341 F.3d at 529.

In determining whether a defendant was in custody, the Court examines the totality of the circumstances to ascertain a reasonable person's understanding of the situation. Salvo, 133 F.3d at 948. Relevant to the inquiry is whether a reasonable individual in the same position as the defendant would have felt free to leave. Swanson, 341 F.3d at 529. Other factors useful in making this determination are:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was

16

voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

Salvo, 133 F.3d at 950; see also Swanson, 341 F.3d at 529. The Court examines each of the interviews in light of these factors.

*(1) May 10, 2013 Interview*

The Defendant argues that the totality of the circumstances show that she was in police custody when she was questioned at the IRS office on May 10, 2013. First, she contends that the agents deceived her about the nature of their investigation by stating that they were investigating Benchmark Capital, when they knew that she faced potential criminal liability. Second, she states that the agents never told her that the meeting was voluntary or that she could leave. Third, she argues that the setting and length of the meeting–at the IRS office, behind a secure metal door, with two armed agents, and lasting beyond the time that she told the agents she had to be at work–were such that a reasonable person would not have felt free to leave. The Government contends that nothing about the circumstances of the May 10 interview suggested to the Defendant that she was in police custody.

The Court examines the circumstances surrounding the May 10 interview to determine whether a reasonable person in these circumstances would have felt they could leave. First, the purpose of the May 10 interview was to determine Rector's involvement and role in what appeared to be a fraudulent mortgage transaction involving Benchmark Capital. The Defendant argues that she was already the target of a criminal investigation at this point and that the agents deceived her

as to the true nature of the investigation.

Based on the evidence presented at the evidentiary hearing, the Court finds that the Defendant was not the target of an investigation by the grand jury on May 10, 2013. Both Agent Martin and Inspector Boles stated that the decision to pursue charges against Rector was made by the United States Attorney's Office after the May 10 and 16 interviews. Nevertheless, even if Rector had been the target of a grand jury investigation at the time of the May 10 interview, she had no constitutional right to be informed of that status. United States v, Washington, 431 U.S. 181, 189 (1977); United States v. Myers, 123 F.3d 350, 354 (6th Cir. 1997) (holding that defendant had no constitutional right to a letter informing him that he was the target of a grand jury investigation prior to his testimony before the grand jury). At the time of the May 10 interview, Agent Martin already suspected that Rector was involved in a fraudulent mortgage transaction and sought to question her about it. "It is well settled . . . that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda." Stansbury, 511 U.S. at 325. Thus, the court finds that even though the purpose of the interview was to gain incriminating evidence about Rector, this factor does not make the May 10 meeting custodial because Agent Martin did not convey his suspicions to Rector.

The Court finds that the location of the May 10 interview–the conference room at the IRS office–was neither hostile nor coercive. The fact that an interview takes place at a police station does not automatically make the interview custodial. Mason, 320 F.3d at 632. In the instant case, the Defendant agreed to meet at the IRS office because it was near her place of work. The IRS office had a locked front door, like any government agency, private home, or private business not open to the public. Despite the fact that the door had to be opened for the Defendant and she was escorted

18

to the conference room, she was not searched and was permitted to keep her cellular telephone on her person. The conference room in which the interview took place was a typical professional meeting room and had windows along one wall. The Defendant's movements were not restrained during the interview, and she had access to the door at all times. Moreover, Inspector Boles described the tone of the interview as pleasant. She stated that the agents never yelled at the Defendant and that the Defendant did not become upset or emotional during the interview. Despite the Defendant's characterization of Agent Martin as looming over her during the interview, the evidence at the hearing reveals that he was seated except for a few occasions when he may have stood to pass her documents or to point to items on the documents. The Court finds that nothing about the location or the tone of the interview supports a finding that it was custodial.

The questioning lasted just over one-hour, which the Court finds is not coercive. The Defendant argues that the length of the interview caused her to be late for work. To the contrary, the Court finds that the agents asked the Defendant if she wanted to end the interview so that she would not be late for work, and the Defendant chose to continue the interview, after calling to alert her employer that she would be late. Although it does not appear that the Defendant was ever expressly told that she was free to leave during the interview, the fact that she was given the opportunity to end the interview and chose not to do so demonstrates that she was not compelled to participate.

Finally, the Court finds that the circumstances under which the interview was scheduled also show that it was not custodial. Upon receiving Agent Martin's business card and learning of his request to meet with her, the Court can infer that the Defendant consulted with her attorney about the matter. The Defendant's attorney then called Agent Martin to learn why Agent Martin wanted to meet with the Defendant. The Defendant then called Agent Martin and agreed to meet with him.

19

The following day, the Defendant arrived at the IRS office of her own accord. The Court finds that this course of events shows that the Defendant freely came to the interview, most likely after consulting with her attorney about whether she should meet with the agents, and was also free to leave, if she had chosen to do so.

Based upon the totality of the circumstances, the Court finds that a reasonable person in the Defendant's situation would have felt that she could have ended the interview and left the IRS office. Thus, the Court finds that the May 10 interview was not custodial and the Miranda warnings were not required.

*(2) May 16, 2013 Interview*

The Defendant also argues that the May 16, 2013 interview, which took place in her home, was custodial because the agents misled her about the nature of their investigation and because they never told her that she could ask them to leave. The Government responds that the agents had no duty to inform Rector of the nature of their investigation and that the circumstances of the May 16 interview reveal that she was not in custody.

In order to determine whether the Miranda warnings were required, the Court examines the circumstances of the May 16 interview. The purpose of the May 16 interview was for the agents to ask the Defendant about some documents bearing her name that had been given to the agents in connection with their investigation of Benchmark Capital. As discussed above, the fact that the agents may have suspected that the Defendant faced criminal liability with regard to the Benchmark Capital matter does not factor into the analysis if the agents' suspicions are not conveyed to the Defendant. Defendant Rector argues that the agents did not tell her that she was a suspect.

20

Accordingly, the Court finds that this factor supports a finding that the May 16 interview was not custodial.

The location and tone of the May 16 interview also lend support to a finding that Rector was not in custody. The interview took place in the Defendant's home. "'[W]hen police question a suspect in a residence,' the encounter 'often' will 'not rise to the kind of custodial situation that necessitates <u>Miranda</u> warnings.'" <u>United States v. Panak</u>, 552 F.3d 462, 466 (6th Cir. 2009) (quoting <u>Salvo</u>, 133 F.3d at 950). Our appellate court has reasoned that

> [i]f a home is a "castle," 3 W. Blackstone, <u>Commentaries on the Laws of England</u> 288 (1768), a secure redoubt from the cares of the world, it presumably is the one place where individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave. It is the rare homeowner who has not exercised these types of control at some point in encountering uninvited visitors. No doubt, some individuals may find it more difficult to do these things during a visit by the police. But all individuals, the meek and the brazen alike, generally will find it easier to exercise such control on their home turf than at the station house.

<u>Panak</u>, 552 F.3d at 465-66. In the instant case, the Defendant invited the agents into her home and asked them to sit down in her living room. Nothing about the setting of the interview was "hostile or coercive." Additionally, the tone of the interview was cordial. The agents did not question the Defendant aggressively or raise their voices, and the Defendant did not become upset during the interview.

The Court finds that the interview lasted forty-five minutes. The length of the interview does not suggest that it was custodial. Although the agents did not inform the Defendant that she could ask them to leave, they called ahead to ask her permission to come to her house. The Defendant

agreed to the meeting and voluntarily admitted them into her home. The Defendant chose the seating arrangements, and the Defendant's movements were not restrained during the interview.

After reviewing the totality of the circumstances surrounding the May 16 interview, the Court finds that a reasonable person in the Defendant's situation would have understood that the interview was voluntary. Accordingly, the Court finds that the May 16 interview was noncustodial and that the Miranda warnings were not required.

### B. The Defendant's Sixth Amendment Right to Counsel Was Not Violated

The Defendant argues that the May 10 and 16, 2013 interviews violated her Sixth Amendment right to counsel because the agents knew that she was represented by counsel and yet interviewed her without her counsel present. "[T]he Sixth Amendment right to counsel attaches only after judicial proceedings have been initiated against a defendant." Moran v. Burbine, 475 U.S. 412, 430 (1986). Moreover, the right to counsel under the Sixth Amendment is "'offense specific,'" meaning that "a defendant's statements regarding offenses for which he had not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." Texas v. Cobb, 532 U.S. 162, 167-68 (2001) (quoting McNeil v. Wisconsin, 501 U.S. 171, 175 (1991)).

In the instant case, the Defendant's Sixth Amendment right to counsel did not attach until she was indicted on May 21, 2013. Thus, the agents could interview the Defendant without counsel on May 10 and 16, 2013. Although the Defendant was represented by Attorney Jonathan Cooper at the time of her interviews, Mr. Cooper represented her on a separate civil matter unrelated to the instant charge. Nevertheless, Agent Martin explained to Mr. Cooper that he wanted to talk with the

22

defendant about her previous work as a mortgage broker with Joyce Allen and Benchmark Capital.

Defendant Rector could have invited Mr. Cooper to attend the May 10 meeting with her but evidently she chose not to do so. Based upon the evidence before it, the Court discerns no Sixth Amendment violation occurred.


## V.  CONCLUSION

After carefully considering the motion, memoranda, testimony, exhibits, and relevant legal authorities, the Court finds no basis to suppress the Defendant's statements. For the reasons set forth herein, it is **RECOMMENDED** that the Defendant's Motion to Suppress Alleged Statements of Defendant Rector [**Doc. 100**] be **DENIED**.[2]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).